# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| VICTOR C. GONZALES, | ) |
| Plaintiff, | ) |
| v. | ) Cause No.: 1:07-CV-00299-WCL |
| MARION COMMUNITY SCHOOLS, | ) |
| Defendant. | ) |

## OPINION AND ORDER

After allegedly being denied promotions and bonuses due to his national origin, Plaintiff Victor C. Gonzales ("Gonzales"), filed suit alleging race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, §2000e, *et seq.* and 42 U.S.C. §1981.[1] In addition, Gonzales asserts a claim for denial of leave time pursuant to the Family Medical Leave Act.

Presently before the court is the Defendant, Marion Community Schools ("the School's") Motion for Summary Judgment filed on February 17, 2009. Gonzales responded on May 22, 2009 to which the School replied on June 5, 2009. Thereafter, Gonzales sought, and was granted, leave file a sur-reply and the School responded. For the following reasons, the School's Motion for Summary Judgment will be GRANTED.

## SUMMARY JUDGMENT STANDARD

---

[1] Gonzales also initially asserted a supplemental state law claim for unpaid back wages but has, in his more recent filings, abandoned that claim.

1

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322; *Ziliak v.*

*AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.,* 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.,* 94 F.3d 353, 354 (7th Cir. 1996). To that end, the court carefully reviews affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir. 1997).

**FACTUAL BACKGROUND**

Gonzales is a 44 year old Hispanic male born in San Antonio, Texas. On September 3, 1996, Gonzales began his employment as a part-time custodian with the School. Within two months, Gonzales became a full time second shift employee at McCullough Middle School. Eventually,

3

Gonzales was transferred to the third shift at Marion High School. At all times relevant to this lawsuit, Bill Bartrum ("Bartrum") served as the custodial services supervisor and Gonzales' supervisor.

### A. **Gonzales's Job Performance**

Throughout his employment, Gonzales received annual performance reviews, conducted for the most part by Bartrum. The interpretation of those reviews is the subject of vastly different views between the parties. The School contends that Gonzales was a bare bones employee just getting by on the job. Gonzales, in turn, asserts he was being criticized unfairly by Bartrum due to racial animus and he was a stellar employee. However, an objective review of the performance reviews themselves reflects that Gonzales fell somewhere in between the two extremes. In his early reviews, Gonzales initially appeared to be meeting the expectations of the School, but, as his employment wore on he began receiving progressively worse evaluations. For instance, from 1996 until 2003, his performance evaluations demonstrated that he met or exceeded the School's expectations in every category assessed. In fact, his 2001 and 2003 evaluations showed him above average - excellent in all categories. However, beginning in 2004, Bartrum began conducting the evaluations and Gonzales's evaluations began reflecting difficulties in work relationships, work quality, initiative, problem solving, and communication.

Gonzales's performance was judged on a 5 point scale with 5 being the best rating. In his April 2004 review, Gonzales's received 2's and 3's in every category. Bartrum, the evaluator in that 2004 review, noted that Gonzales was "not an analytical thinker," "not engaged in any methods of making [his] work more efficient," needed "to work on communication both orally and in writing," and "need[ed] to increase [his] teamwork approach, including getting along with all co-workers."

4

This final comment related to a series of incidents witnessed by Bartrum between Gonzales and a co-worker Wendell Allen. Bartrum witnessed several conflicts between the two men including one in which they were yelling at each other and counseled both of them about improving their relationship. Allen's performance reviews similarly reflected these problems.

In his review for the period ending in June, 2005[2], Gonzales's scores were worse than the previous year and he received 0's in certain categories such as work relationships, work quality, initiative/reliability. In the section titled "Developmental Plan," Bartrum wrote "there are many areas to work on and much room for improvement. Your job is in jeopardy. You will be reviewed again in 30 days." (Review for period 6/04- 6/05). Although the plan indicated there would be another review within 30 days, the record is void of any such review. Moreover, while the School has a progressive discipline policy, Gonzales never received discipline under that policy based upon his performance reviews.

Nevertheless, it appears that Gonzales's performance did improve after the 2005 review. In 2006, Bartrum turned over the evaluation responsibilities to Justine Pond and Darrell Smith, who were first and second shift custodial supervisors. In Gonzales's 2006 review, his scores improved to 2's and 3's and by the review period of June 2006 - June 2007, Pond's review of Gonzales reflects that he was above average in the safety category and his other categories had improved. Gonzales did, however, get counseled on his attendance and was told that he should "work on improving attendance." Although Bartrum did not conduct the performance appraisals after 2006, he did review and sign off on the appraisals done by Pond and Smith.

---

[2]There are two evaluations in the record which appear to overlap dates on the face of them.. One shows a performance period of April 2004 - April 2005; while a second review shows a performance period of June 2004 - June 2005. However, the signature pages reflect that one review was conducted and signed off on by Gonzales in 2004 and the second in 2005.

Despite his declining performance reviews and the problems documented therein, Gonzales did receive letters of thanks for his service to the school and employee awards throughout his employment. Gonzales also became frustrated with what he believed to be deflated performance reviews and created his own performance reviews which he distributed to teachers at his school. In contrast to the performance reviews he received from his supervisors, these self-administered surveys reflect high scores with teachers commenting that Gonzales was "always pleasant and respectful," "goes the extra mile during all extra-curricular activities," and "does the extras." One teacher described Gonzales as "the most professional custodian" he had worked with in twenty-five years of teaching.

### B. Evidence of Discriminatory Animus

As early as 1997, Gonzales asserts that he became the subject of various kinds of discrimination. In the summer of 1997, Gonzales overheard Bartrum tell a group of summer workers that "he understands whites, he barely understands black people, and he didn't understand Mexicans." Some undesignated time thereafter but prior to 2003, Gonzales was told by a co-worker that Bartrum made a comment while Gonzales was off from work that he "would take away his green-card" if he didn't return the next day.

Gonzales states that co-workers and temporary summer help also participated in the discrimination by making derogatory comments. He recounts one instance in 2005 where a coworker told him to "jump in the truck" because they were going "tomato picking." Gonzales also recalls the summer workers drawing caricatures with Mexican foods on them and placing his name on the drawings. Once one of the caricatures had written on it "your mama is a taco." Gonzales complained to Bartrum and, according to Gonzales, Bartrum instructed the summer workers to cease

6

this type of behavior. Gonzales contends that it continued and nothing further was done by Bartrum to remedy the behavior since the help was temporary.

C.      **Denial of Promotions, a Bonus, and FMLA Protection**

Gonzales became eligible for promotion in November, 1998 and, at various times throughout his employment, he spoke with his supervisors, Bartrum in particular, about pursing a promotion; yet, he was never given an opportunity to apply for at least three positions that were filled during the time in question.   He believes this was due to discrimination.

When positions came open in the custodial department, they were typically  posted online. According to Bartrum, exceptions to this general rule occurred in situations where there would be a lateral transfer of an existing employee or if the position was not intended to be filled on a permanent basis.  Moreover, the only way to be promoted from the position of custodian is if there is an opening as a lead custodian or a supervisor. Bartrum and a building principal interviewed the selected applicants when a job opportunity became available..

On several occasions during Gonzales's employment, positions as custodial staff supervisors became available but were not posted.  Gonzales claims that he repeatedly spoke to Bartrum about the possibility of becoming a custodial supervisor; yet Bartrum discouraged Gonzales from doing

so. Instead, Bartrum promoted Smith,[3] Pond,[4] and another employee, Daniel Castillo.[5] Ironically, however, Gonzales does not believe he should have received the promotions in any of these cases. For instance, he testified that in the case of Smith, another employee with more seniority, should have received the promotion. With respect to Castillo, who is Hispanic also, Gonzales contends that he was only promoted <u>because</u> he is Hispanic and Gonzales had filed a charge with the Metropolitan Human Relations Commission. And, finally as to Pond, Gonzales claims that she was hired because of her gender not because of any animus toward him.

Gonzales also references another time during his employment when he sought to transfer shifts due to his wife's illness. This transfer request was also denied as there was no opening in the shift Gonzales for him to transfer to.

At the beginning of the 2006-2007, the School determined that due to fiscal circumstances it could not afford to offer permanent pay raises to its employees. However, with a variety of budget cuts, the School freed up funds for an employee incentive/bonus program. Under the program, full time employees became eligible for a $400.00 bonus and part-time employees were eligible for a $200.00 bonus upon the satisfaction of certain performance expectations. The employee performance incentive program was in effect from September 4, 2006 through October 27, 2006.

---

[3] Smith, a white male, was promoted from a second shift custodian to a second/third shift supervisor at the high school in 2001. For financial reasons, a position of shift supervisor for the second shift had not been filled since 1988 or 1989. However, a need arose for supervision in the high school for second shift. As a result, Bartrum transferred Smith to this position and opted not to post the position. Gonzales believes another custodian with more seniority than Smith should have received the position. However, Smith was already an experienced shift supervisor and received a lateral transfer while the other individual had no supervisory experience.

[4] With respect to Pond, she was hired from outside the School as a custodial supervisor. Again, the position was not posted.

[5] Castillo is a Hispanic male who was promoted to supervisor after Gonzales filed his Charge with the Marion Human Relations Commission.

During that time, employees were required to maintain perfect attendance, maintain an acceptable safety record, and maintain an acceptable disciplinary record during the performance pay period or in the employees most receive performance evaluation. Bartrum was responsible for determining which members of the custodial staff were eligible for the bonus.

Of the approximately sixty (60) custodians who were eligible for the bonus, only five, including Gonzales, did not receive it due to attendance or performance problems. Gonzales did not receive the bonus due to attendance issues since he missed an entire week of work during the performance period. Gonzales missed the week of September 25, 2006 due to illness. Gonzales also was on vacation during the last day of the bonus period. According to Bartrum the focus of the attendance requirement was not on whether a particular absence was excused or unexcused. Rather, the "actual attendance" of the employee was calculated since any missed work, be it excused or unexcused, cost the School additional fund to hire substitutes.

Gonzales disputes the denial of the bonus above and believes that his absences from September 25 to September 28, 2006 for a "serious health condition." (Gonzales Aff. ¶ 20) should have fallen under the realm of the Family Medical Leave Act provisions. The reason for this absence remains opaque; however, Gonzales states that he told Bartrum that if he had any questions regarding the absence, Bartrum was free to contact his doctor. (Gonzales Aff. ¶ 19.) Gonzales was not offered and did not receive FMLA leave for these absences. (Gonzales Aff. ¶ 19.) While leave under the Family Medical Leave Act ("FMLA") was not calculated into the attendance record, Gonzales contends that at least one other employee was exempted from the rigid attendance requirements and received the bonus despite having missed a day of work during the incentive period.

9

In addition to the above leave time he believes he should have been credited, several times throughout his employment Gonzales states he required leave under the FMLA but was neither offered or credited for it. In July 2006, Gonzales was hospitalized overnight due to an ongoing heart problem and given specific medical restrictions. He notified the School of his need for leave for this serious health condition. However, the School's FMLA policy required that employees expend sick leave in order to qualify for FMLA leave. Gonzales followed the policy and was accordingly paid for his time off and the leave was not counted as FMLA leave. Thus, it does not appear that he was penalized for these absences nor did the absence occur during the employee incentive program so it was not factored into the decision to deny him the bonus.

Based on the above facts, Gonzales filed a Charge of Discrimination with the Marion Human Relations Commission in December 2006. Subsequently, Gonzales filed a Charge of Discrimination with the EEOC on April 6, 2007 alleging race and national origin discrimination as well as denial of FMLA leave. He was issued a notice of right to sue on August 31, 2007 and filed the present action on November 27, 2007.

## DISCUSSION

As noted above, Gonzales alleges discrimination based upon race and national origin in violation of Title VII[6] and 42 U.S.C. §1981. In addition, he raises a claim for denial of FMLA protection. Each of these claims shall be addressed in turn.

**I.  Discrimination Claims**

---

[6]Title VII protects employees from employers who "fail or refuse to hire or ... discharge any individual, or otherwise ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ...national origin." 42 U.S.C. § 2000e-2(a). Discrimination includes claims of harassment creating a hostile work environment and claims that an employer retaliated against an employee for complaining of perceived discrimination.

Before challenging an unlawful employment practice under Title VII, an employee must first file a timely EEOC charge. *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S.Ct. 2162, 2166 (2007). Such a charge must be filed within 300 days after the alleged unlawful employment practice occurred or else the employee may not challenge the practice in court. *Id.* at 2166-67. The Supreme Court has emphasized the need to identify the specific employment practice that is at issue when considering whether an EEOC charge was filed on time, noting that "[t]he EEOC charging period is triggered when a discrete unlawful practice takes place, ... [but] current effects alone cannot breathe life into prior, uncharged discrimination." *Id.* at 2169. An employment practice is a "discrete act or single occurrence that takes place at a particular point in time." *Id.* (internal quotation marks omitted).

In this case, Gonzales filed his EEOC Charge on April 6, 2007 and his present lawsuit on November 27, 2007. Thus, any acts of discrimination that occurred prior to June 10, 2006 are barred under Title VII. Gonzales has, however, also asserted claims pursuant to 42 U.S.C. §1981 which has a four year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.,* 124 S.Ct. 1836 (2004). Thus, incidents occurring prior to November 27, 2003, four years prior to the date Gonzales filed this suit, becomes the relevant date under that statute.

This said, Gonzales has referenced discriminatory comments by Bartrum that were allegedly made in the late 1990s and he has also made reference to a promotion to supervisor received by Smith in 2001. All of these incidents fall outside both limitations periods and thus are time barred.[7]

---

[7] There appears to be no dispute from Gonzales that some of these instance are time-barred. See Pltf's Resp. at 13).

11

This appears to leave only the three promotions that occurred during Gonzales tenure as well as his failure to receive a bonus as the basis for his discrimination claims.

### a. Failure to Promote

Turning first to Gonzales's contention that he was not promoted due to discrimination, Gonzales may be prove his claim either directly, such as by an admission by the defendant, or indirectly under the burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Herron v. DaimlerChrysler Corp.,* 388 F.3d 293, 299-302 (7th Cir.2004); *Alexander v. Wis. Dep't of Health & Family Servs.,* 263 F.3d 673, 682 (7th Cir.2001). For his discrimination claim, Gonzales makes only a general argument relating to the direct method. For instance, he asserts that Bartrum made one derogatory statement in 1997 in Bartrum's presence, and learned second hand from a co-worker of a second derogatory statement (*See* Pl.'s Br. in Opposition at 2). However, as noted above none of these comments fall within the relevant limitations periods and, even if they did, this sort of statement made well in advance of any adverse employment decision to the plaintiff is the paragon of what the Seventh Circuit has referred to as a "stray workplace remark." *See Rahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (1997) (holding that isolated, discriminatory statements targeting an Asian Indian employee were "'stray workplace remarks' that [were] not clearly linked to the decision to terminate [the plaintiff's employment]). Before such a remark will qualify as direct evidence, it must be demonstrated that the statement was related to the employment decision in question. *Cianci v. Pettibone Corp*., 349 F.3d 1055, 1063 (7th Cir. 2003). Here, the alleged comment, while inappropriate, does not go to the heart of any employment decision nor has Gonzales alleged that his workplace was rife with these sorts of comments or that Bartrum routinely made such statements. At most he has alleged some

12

isolated bigotry based upon his national origin. Thus, the direct method has not been satisfied and Gonzales must proceed under the indirect method.

*McDonnell Douglas* places the initial evidentiary burden on the plaintiff to establish a prima facie case, which is the same whether the claim is brought under Title VII or § 1981. And thus, to survive summary judgment, Gonzales must navigate through the oft-recited *McDonnell-Douglas* standard:

> First, a plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. If the plaintiff makes out a prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to come forward with evidence of a 'legitimate, nondiscriminatory reason' for discharging the plaintiff. Finally, 'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

A plaintiff successfully proffers a prima facie case of race/national origin discrimination when he shows: (1) that he is a member of a protected class; (2) he was performing according to the employer's legitimate expectations; (3) plaintiff suffered an adverse action; and (4) similarly situated white individuals were treated more favorably. As to the first and third prongs, there is no material dispute of fact: as a Hispanic, Gonzales is a member of a protected class, and the School cedes that its failure to promote Gonzales constitutes an adverse action sufficient to meet the third prong.[8] (Br. in Support of Def.'s Motion at 12.) What Defendants do challenge is the second and fourth prongs,

---

[8] However, it must be noted that the School's decision not to transfer Gonzales to a more desirable location and atmosphere, but with the same pay and benefits, is not an adverse action. In *O'Neal v. City of Chicago*, it was held that a transfer involving no reduction in pay and no more than a minor change in working conditions is not deemed materially adverse. *O'Neal v. City of Chicago* 392 F.3d 909, 913 (7th Cir. 2004). Indeed, the converse is also true.

i.e., that Gonzales was performing his job satisfactorily at the time of any adverse action and that similarly situated others were treated more favorably.

As to the second prong, the School states that Gonzales was not meeting its legitimate expectations. Specifically, the School cites performance evaluations characterizing the Plaintiff's performance as "well below average" and cites concerns in the areas of attendance and work relationship. (Br. in Support of Def.'s Motion at 12-13.) However, Gonzales disputes these evaluations, citing Bartrum's involvement in the evaluation process as evidence of bias. (Gonzales Aff. ¶ 13.) Yet, under this same logic, the results of the self-administered surveys that Gonzales solicited and now submits as evidence of satisfactory job performance from non-random faculty members are subject to the same taint. And even if earlier job performance reviews were positive, the Plaintiff is not entitled to rely on them. *See Hefley v. Village of Calumet Park*, 239 Fed.Appx. 276, 278 (7th Cir. 2007) (holding that a white police officer was not entitled to rely on earlier, positive reviews, but was required to show that he was meeting legitimate performance expectations at the time in question). Therefore, Gonzales must demonstrate that he was meeting the reasonable expectations of his employer at the time of the adverse action. *See id.* Instead, the performance reviews and affidavits at hand contain examples that indicate difficulties in the areas not limited to attendance, motivation, and maintaining professional relationships—especially as demonstrated by the long-standing dispute with fellow custodian, Wendell Allen. (Bartrum Dep. Ex. 3 44: 25-49:25; Br. in Support of Def.'s Motion at 3, 13.) Thus, while the court will not attempt to resolve factual disputes, *Waldridge,* 24 F.3d 918, 920, Gonzales has not demonstrated that he has met the reasonable expectations of his employer or raised a question of fact that points to a biased review process. *See Lenoir*, 13 F.3d 1130, 1132.

Even if Gonzales had met the second prong, the final prong also proves difficult. Gonzales must also show that his employer treated similarly-situated employees outside his classification more favorably. *See Lenoir*, 13 F.3d 1130, 1132. While it is disputed as to whether the School followed its own policies in posting the various positions for which Gonzales hoped to be promoted, the ensuing dispute does not transcend the fact that Gonzales must nonetheless prove this final prong and demonstrate his superior qualifications to establish a prima facie case of discrimination on the promotion claim. *See Hobbs v. City of Chicago*, No. 07-3591, 2009 WL 2151308, at *4 (7th Cir. July 21, 2009). Merely *arguing* superior qualifications is not enough. *See id.* Instead, the Plaintiff's qualifications will only serve as evidence of pretextual discrimination if the difference between the qualifications of the Plaintiff and the promoted employees are "so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Id. quoting Millbrook v. IBP. Inc*, 280 F.3d 1169, 1180 (7th Cir. 2002). Such evidence is not presented in this case.

While it is alleged that the similarly situated employees who promoted were less experienced and skilled (Compl. ¶ 4), the well-documented concerns noted above do not present evidence necessary for a reasonable person to determine that the Plaintiff was "clearly better qualified for the position." In fact, the School stated that the qualifications considered for promotion include "leadership ability, attendance, and being a self-motivator." (Br. in Support of Def.'s Motion at 4; Bartrum Dep. p. 25:21-26:10.) The School has documented concerns about Gonzales in these specific areas and, as noted previously, there has been no evidence that the documented concerns were fabricated or the result of biased decisionmaking. Moreover, even in cases where the promotion process may be questionable, the Seventh Circuit has recently reaffirmed that it is not the

position of the court to "[] sit as a superpersonnel department where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." *Hobbs* 2009 WL 2151308, at *6 *quoting Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2000). Ultimately, then, Gonzales's failure to promote claim fails.and the School is therefore entitled to summary judgment on claims relating to Title VII and § 1981.[9]

### b. Denial of Bonus

It is unclear from the filings whether Gonzales is also asserting that the decision to deny him a bonus was the product of national origin discrimination or whether it is more appropriately categorized as a consequence of being denied FMLA leave. However, to the extent that he does argue the denial of the bonus as a discriminatory act, it is clear that this claim fails as well.

As part of the bonus program, Gonzales was required to have perfect attendance. It is undisputed that he did not have perfect attendance during the incentive period. In addition to Gonzales, six other employees (3 caucasians, 2 females, and one African-American employee) also did not receive the bonus for either attendance or performance issues. In addition, Gonzales concedes that Castillo, another Hispanic employee, received the bonus which lends credibility to the School's contention that race or national origin played no role in the decisionmaking process.

Nevertheless, Gonzales attempts to circumvent the attendance requirement by claiming that two other white employees, to whom he was similarly situated in all respects, did not have perfect attendance during the period and still received the bonus. However, as to one employee, Mr. Kidwell, he missed four days of work for open heart surgery and did not receive the bonus.[10] The

---

[9] *See Lalvani v. Cook County, Ill.*, 269 F.3d 785, 789 (7th Cir. 2001) (applying the same standards for Title VII as § 1981 claims).

[10] Kidwell did not qualify for FMLA leave for his illness since he did not meet the requirement that he be employed the requisite number of hours prior to requesting leave.

second employee, Ms. Beeman, missed one day during the relevant period and, it is true, she did receive the bonus. No explanation is given as to why Beeman was given the bonus. Regardless, however, Gonzales had a history of performance related issues and missed 4 days within the bonus period and also missed the last day of the bonus period, thus, he is not similarly situated to Beeman.[11] Accordingly, since Gonzales has not set forth any similarly situated employee treated more favorably than he, he has not set out a prima facie case that his denial of the bonus was discriminatory. Thus, the School is entitled to summary judgment on Gonzales's discrimination claim based on the bonus.      **II. FMLA Days and Bonus Issues**

Gonzales also asserts a second claim asserting that the School failed to count certain absences as FMLA absences and, in addition, the School utilized the absences against him to deny him promotions and a bonus. It is undisputed that the School did not credit the Plaintiff with FMLA leave for absences arising in September of 2006. Similarly, it is undisputed that because of these absences Gonzales was denied the bonus. Thus, to resolve the remaining claims, it is necessary to determine whether a bonus was warranted, and, because attendance was a factor in withholding the bonus, whether FMLA days were wrongfully withheld from the Plaintiff.

The FMLA allows eligible employees to take up to twelve weeks of unpaid leave in a twelve-month period for certain qualifying reasons, including serious health conditions. A "serious health condition" is defined by the FMLA as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). 29 U.S.C. §

---

[11]The absence of an explanation from the School as to why Beeman was deemed to have qualified for the bonus despite having missed a day of work is perplexing and, fortunately for the School, does not have more import in this case..

2612(a)(1). In addition, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." See 29 U.S.C. § 2614(a)(1); see also 29 C.F.R. § 825.220(b) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.").

To prevail at summary judgment on his interference claim, Gonzales need only raise a genuine issue of material fact that: (1) he was eligible for the FMLA's protections; (2) the School was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) the employer denied his FMLA benefits to which he was entitled. *Burnett*, 472 F.3d 471, 477. Here, it is not disputed that he was eligible for FMLA protections or that the School was covered by FMLA leave: Gonzales has been granted FMLA leave in the past without issue. However, the School contends that Gonzales cannot raise a genuine issue of material fact that he was entitled to leave under the FMLA..

> A plaintiff qualifies for FMLA leave if:
>
> (1) he is afflicted with a "serious health condition" and (2) that condition renders him unable to perform the functions of his job. 29 U.S.C. § 2612(a)(1)(D). An employee has a "serious health condition" within the meaning of the FMLA, where he has "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

*Id.* at 477-478. In addition to these provisions, the School's own FMLA policy allows FMLA leave for "serious health" conditions including illness or injury requiring an overnight stay at a hospital, or continuing care by a healthcare provider. (Pl.'s Response in Opposition; Ex. 23 at 2.)

During the bonus period covering from September 4, 2006 to October 27, 2006,[12] Gonzales took several absences during the week of September 25, 2006 for what he has termed a "serious health condition."[13] (Gonzales Aff. ¶ 20.) However, the record is completely silent on what the "serious health condition" might have been and only a single brief implies that the leave in question may have been related to Gonzales's heart condition. (*See* Pl.'s Sur-Reply Br. At 6.). However, when Gonzales's affidavit is read as a whole, it does not lead one to logically conclude that the September absences are, in fact, related to the heart conditions in July or any other illness for which the School could have discerned there to be a serious medical condition. (*See* Ex. 1, Gonzales Aff. ¶¶ 19-20). Gonzales further avers that he contacted Bartrum to inform him of his illness and need for several days off work. But, without further explanation or documentation for this leave the School is without any notice that the days off were, in fact, for FMLA qualifying reasons.[14] In *Haefling v. United Parcel Service, Inc.*, the Seventh Circuit held that "[w]hether illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so." *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 499 (7th Cir. 1999). Indeed, here, Gonzales merely asserts that he is entitled to FMLA protections without clearly disclosing the reason for the

---

[12] As set out in the facts, Gonzales was hospitalized in July 2006 for conditions related to his heart for which he had previously been granted FMLA leave in 1999. The School's FMLA policy required that employees expend sick leave in order to qualify for FMLA leave. (Ex. 23 at 2.) Gonzales followed the policy and was accordingly paid. Thus, no violation exists for these July 2006 absences. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (holding that FMLA relief is improper if the employee has not been "prejudiced by the violation.").

[13] The school also asserts that Gonzales missed the last day of the bonus period. However a single day is not material. The school concedes that Nina Beeman was awarded a bonus, despite having missed a day during the bonus period. Thus, it is clear that missing just one day was not determinative. (Br. in Support of Def.'s Motion at 6).

[14] Unlike the July absences, there is no disability certification for the September absences.

entitlement. This is facially insufficient. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific *concrete* facts reflected in the record, cannot preclude summary judgment. *Albiero*, 246 F.3d 927, 933; *Stagman,* 176 F.3d 986, 995; *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295. Thus, Gonzales fails the third prong, which requires a showing that he is entitled to leave under the FMLA. The School is therefore entitled to a summary judgment on Gonzales's FMLA claim.

## CONCLUSION

Based on the foregoing, the School's motion for summary judgment, is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant.

Entered this 8th day of September 2009.

s/ William C. Lee, Judge
United States District Court
